Good morning. May it please the Court. The issue is whether the City had a duty to investigate the sexual harassment complaint of employee Karen Walpole. Once we determine whether there was a duty, we then look to determine whether that duty was negligently breached by the City. Regarding the issue of a duty, this Court has said in Porter v. California Department of Corrections that the primary objective of Title VII is remedial, avoiding and preventing harm. In granting the City's motion for a summary judgment, the lower court thwarted that most important policy. As this Court stated in Swenson v. Potter, Well, I have a question about Swenson. Because Swenson held that 16 incidents of staring over a 14-month period did not amount to sexual harassment, even allowing for the fact that Swenson might have been particularly sensitive, how does that impact your case? Judge Callahan, that behavior occurred in the post-relief time period. And those were mere passing glances. There's nothing of the nature here where we have a person covertly standing behind a plant watching Ms. Walpole in another occasion, three previous occasions, with binoculars from a nearby stairwell observing her every action. Can I ask you a different question? Assuming that this is pervasive and this amounts to stalking, which it sounds a little bit like, what my understanding, we're talking about Title VII, right? Yes, Your Honor. My understanding of Title VII is that there has to be some kind of adverse employment action. Is that incorrect? Your Honor, the misconduct, the harm must be so pervasive that it changes the conditions of the workplace. And we have that. One thing, Mr. Britton, I can hear you, but I just can barely hear you. And you may want me to hear every word you say. Okay. Well, I guess my question was, what happened to her? What are the compensatory damages that she is seeking? Because I don't quite see what she didn't – she wasn't constructively fired. She wasn't demoted. As I understand it, her workstation wasn't changed. I don't see that she was alleged to have been denied any promotions, that her quality of her work suffered so that she had something happen to her that wouldn't otherwise have happened to her by the employer. So that's what I'm not quite understanding. Yes, Your Honor. Judge Schroeder, we are seeking compensatory damages for the emotional anguish and distress that Karen Walpole suffered after the June 29, 2000 observation by Mr. Beasley. She said that not only did she think that he may again start to harass her. What's the measure of those damages? The measure of those damages? She was emotionally distressed. She sought many, many counseling sessions with a therapist. She said not only could she not wonder – was she wondering whether indeed Mr. Beasley again was going to accost her in some way, but she had lost all faith in her employer's ability. Is that sort of thing compensatory under Title VII? Yes, Your Honor. Emotional anguish is obviously what's going on. Regardless of whether the damages arise to some level of a diagnosed condition. Are you saying that you don't have to have any adverse employment action by the employer? Yes, Your Honor. By inevitably permitting the condition to continue, the employer has adversely affected her condition. But she didn't lose any wages as a result of this? You are correct, Your Honor. Well, you're claiming hostile work environment, right? Yes, Judge. And so we're really looking at essentially there's, what, two instances of staring, right? And, you know, I guess what is your best argument that the work environment was subjectively and objectively hostile, given that Ms. Walpole's testimony, she went about her business, quote, unquote, carefree, not caring who was around, unquote, during the eight months between the first and second staring instances. Judge Callahan, we are seeking compensation for the time period after the June 29, 2000 example of stalking her. So you're saying that you have one instance then? Collectively, combined with the previous ones, we have that one instance, and we have in the month preceding that June 29 instance three occasions when coworkers of Ms. Walpole also observed Mr. Beasley watching her with binoculars. If she didn't know about it, how is this emotionally terrible for her in June? Good question. On page nine of the reply, we have cited American Guarantee and Liability versus 1906 Company. There the court granted damages for people who were videotaped without their knowledge while in stages of undress. We have that collectively with her saying initially, I don't want to have any relationship with you, I'm not in love with you, stay away from me. We have that coupled with the various instances of him attempting to build a romantic relationship, coupled with his watching her from behind the plant, telling her colleague that she had made it all up, that indeed it was Walpole pursuing Beasley. Those collectively combined gave us the necessary, reached the necessary threshold to support a claim for Title VII. Could you just run through the chronology again of what happened in June and what happened later in October? Previous to October 22, 2000, Mr. Beasley had increasingly built up his desire for an intimate relationship with Ms. Walpole, taking her hand, bringing her flowers, kissing her, all those things she permitted but reluctantly. Finally he expressed his love for her, she said, stop, this has gone too far, get over it, I don't want it. When was that? That was in late September or early October 2000. Well, October 23rd was the time that she took, she had Tommy come with her to tell him. The 22nd, Judge Callahan, was when he was observed watching her as he stood behind the plant. The next day is when Karen Walpole went with Tommy Cable and complained directly to him. Okay, so the first complaint, the first was the 23rd to the supervisor? No, Your Honor, that was the 24th. 24th, okay. And that's when they said point blank, this is what's been happening, and the supervisor said, I'll take care of it, I want that man out of this building. She never followed up on that. She breached her duty to investigate. The supervisor? Yes, Your Honor. There's every reason to believe that had she investigated, she would have found out the extent of this and she would have been able to impose remedial efforts crafted to stop the harassment. And nothing ever would have happened. Well, when does this emotional stress and trauma and therapy begin then? It follows the June 29, 2001 incident where he was in the stairwell watching her. And then within an hour thereafter she learned that on three previous occasions in that month he had done the same thing with binoculars, all with none of her colleagues, not even her supervisor, Tommy Cable at that time, acting to stop it. And this is what happens when no investigation is taken. It sends a message that we just don't take these complaints seriously. The court has said in Fuller, well, the court also said in Swenson, an investigation is a key step in the employer's response and can itself be a powerful factor in deterring future harassment. Ms. Bertley, the supervisor, took it on herself to decide unilaterally that nothing was reported because she Okay, so June 2001 is when her compensatory damages begin that you're saying? Yes, Your Honor. Whatever they are. Yes, Your Honor. And continuing to when? Until at least a year thereafter. During the time that she was seeking therapy, counseling from a therapist. What is she trying to get, the cost of the therapy? That in addition to the mental anguish that she was suffering. And all of this investigation, this duty to investigate was dismissed because Ms. Bertley took it on herself to view this as a mere personal aspect. View what? As a mere personal aspect. As a little argument between Beasley and Walco. This court said in Fuller, an employer whose sole action is to conclude that no harassment occurred cannot in any meaningful sense be said to have remedied the situation. When did the supervisor learn about the binoculars and all of that? She saw that previous to June 29, 2001, and yet did nothing. That was the same Tony Cable that had complained with Walco to Supervisor Bertley back in October 24, 2000. I would like to re- Well, you don't have any time left, but we'll give you a minute. Thank you. We hope to use the time. Good morning, Your Honors. May it please the Court, my name is Mark Ishikawa, and I'm representing the Appalachee City of Mason in this matter. The basic premise in terms of this appeal is this, that the district court found that there was no hostile work environment there, and the facts presented, the record presented does have sufficient information and facts there to support that finding by the district court. Number one, all of the things that occurred prior to October 23, 2002, were admitted by plaintiff to be consensual. She testified in her deposition that was presented in the motion for summary judgment that she never got any hostile comments, any threats, any kind of mean- I'm confused on the year. Was it October 23rd, which year? October 23rd of 2000. 2000. Mr. Scott, excuse me. Yes. Mr. Scott, you said the court found such and such. Wasn't this case decided on summary judgment? Yes. So there were no factual findings. The court made a ruling as a matter of law. There was no facts. Correct. I thought you said the court found such and such. Maybe I misunderstood you. Well, no. What I meant to say, if I did say that, was that the evidence presented in the record presented on the motion for summary judgment indicated that the plaintiff's testimony herself in her deposition said there was no hostile comments, no meanness towards her, no threats, physical or emotional, towards her, and that was presented in the motion for summary judgment. Prior to October 2000? Right. Okay. Well, isn't it fair that the city was on notice of the stirring incident and Mr. Beasley's romantic interest in Walpole as of November of 2000? Your Honor. Given that Ms. Cable, who became Walpole's supervisor in November of 2000, was with Walpole in October 2000 when she told Beasley to leave her alone. Yes. Ms. Bertling, Priscilla Bertling, was the customer service supervisor at the time, and Ms. Tommy Cable was a co-worker. She was not the supervisor at the time. She became a supervisor. Later on, yes. A month or two later. So as of November of 2000, she had knowledge. A supervisor had knowledge. She had knowledge of the fact that friendship had asked to be stopped by Ms. Walpole and that she got a different version of the relationship from Mr. Beasley, the security guard, and then one incident of him looking at her while she was at her workstation. But for summary judgment purposes, we have to take the evidence most favorable to the plaintiff, correct? Correct. So Walpole in November knows of one staring incident, right? Yes. And why isn't the history of Beasley's romantic interest in Walpole, coupled with the first staring incident, sufficient to overcome summary judgment? Well, number one, the relationship between both Mr. Beasley and Ms. Walpole was consensual at the time. Ms. Walpole stated up to the point of October 2000. October 2000. Right. At that point in time, Ms. Walpole stated that she wanted to stop the friendship that they had. So it was basically a termination. Everything that happened after that, which included episodes that looked to me like stalking, was nonconsensual. Well, there was one incident where it appeared that he was staring at her from the workstation, yes, in October 22, 2000. And then the next incident where he was reportedly looking at her from a distance was not until eight months later in June, at the end of June 2001. Okay. Now, in the eight months in between, I guess it later comes out that there are some people that might have seen him looking at her. All right. Walpole doesn't know about that in the eight months, right? No. And she makes the comment, I was going about my work carefree and this, that, and the other. Right. Does the employer know during those eight months of anything that's going on? No, not until the end of June 2001 did the city of Mesa, through Tomei Cable, learn that there may have been some situations where Mr. Beasley was watching Ms. Walpole from a distance. When was the episode where the supervisor said, I'll take care of it? Was that in October? That was in October 2000. And it wasn't taken care of? Is that fairly clear on this record, at least so far as we have to assume? Well, the information, the evidence that came out was that Ms. Walpole was going to send an email to the supervisor, and she did in a vague way, and she said that if things need to be taken care of, please take care of them. When was Beasley separated from her? Somebody moved to a different building? He was in the same building, but he was put on a different shift, so he was in there half the time, and then he was out on medical leave a portion of that eight months also. When was he put on a different shift? It was in the same fall, probably. Well, actually, he was put on a shift before the October events, yeah. In fact, that was one of the incidents where Ms. Walpole actually made a cake for him because he was leaving on a different shift. But that was before October, before she complained. But that was still in effect during October. Did Ms. Walpole complain of any incidences from the first staring to the last one? No, Your Honor. And basically, except for the one staring incident at the end of October 2000, until Tomi Cable became aware of herself seeing the staring by Mr. Beasley at the end of June 2001, about eight months went by without any sort of thing occurring, any type of staring event occurring. In all that time, there was no indication that Ms. Walpole was aware. That's one of the premises that we have that wasn't a hostile work environment because she wasn't aware of anything that affected her work. Were they finally separated completely? Yes, in June. See, that was in June, right? As soon as those events occurred in June, Your Honor, then he was reassigned within a day or two and put into a different building. And so all of that was put to a stop in June of 2001. Basically, if you take a look at the answer, the things that Mr. Britton points out in terms of Ms. Cable in June and learning of some other staring events at the end of June, he does not plead those in the answer, I mean in the complaint. The only references he makes is to Ms. Britton's actions in October of 2000, and so those aren't sufficient in terms of his cause of action. It's a situation here where both the objective and subjective standards have to be met for hostile work environment. Ms. Cable didn't realize or was not aware of any staring incidents except for two of them in October, and then again at the end of June. And then at the end of June, Mr. Beasley was reassigned. So subjectively, that standard was not met by her. Objectively, we submit that basically she was aware of two staring incidences when they occurred. The others were when she wasn't aware of them. And some of the incidences that were reported in June were probably the same incident because they occurred at lunch hour, around the lunch hour, on the day that Ms. Cable went and advised Ms. Walpole that Mr. Beasley may be looking at her. Mr. Chagall, would you state as simply as you can the narrow issue that is before this Court on this appeal? The what, Your Honor? The narrow issue that is before this Court on this appeal. Basically, whether there was a hostile work environment, and the record shows that there was not a hostile work environment. There was, at the most, five staring incidences that were not. The record has to show that there was not a hostile work environment or that there was not enough legal, that there was not enough alleged to raise the question of a hostile work environment. In Swanson, this Court itself determined that as a matter of law, that 16 staring incidences, along with sexually charged comments, were insufficient to formulate. I'm asking you, what is the question? What do we have to ask ourselves? What do we have to resolve? You have to resolve whether indeed this was a hostile work environment for Ms. Walpole. As a matter of law. As a matter of law. Well, I think it's narrower than that. That's why I ask you this succinctly and as narrow as you can. That isn't the question before us, Ms. Disikow. We're going to have to answer a question, and I wanted you to tell us what it was. I've listened to your argument, and he's coming to rebut, and I'm not so sure that he knows what he has to rebut. What? Well, I guess the – Let me state it, and then you say it. All we have to decide is whether the allegations were sufficient to raise a question, a fact, or try a fact. And I submit because of the events as a matter of law, the facts were sufficient so that it could be determined as a matter of law by the Court. Thank you. Mr. President, I could hardly hear some of the things you were saying, and in my view, you've got a heavy burden. And I hope you carried it, and I'll listen to the tapes, and I'll see if I can hear you on the tapes. But in your rebuttal, if you just raise your voice a little bit, I'll hear you. This doesn't amplify. It just records. Your Honor, the issue before us is whether the city negligently breached its duty to conduct an investigation. We have credible evidence from Tomie Cable herself, who said – Why is that the question? The case was decided on summary judgment. That is the genuine issue of material fact that precludes summary judgment, Your Honor. This Court must realize that the lower court is thwarting the primary objective of Title VII by saying it didn't matter that Priscilla Bertling never conducted an investigation. No. You have to create a triable issue as to whether there's a hostile work environment. That's what the Court's deciding on summary judgment. And on summary judgment, you take all inferences in favor of your client, the facts that are all favorable for your client, and you have a body of facts that go what the relationship was up to it, what the incidence of staring, and then you take all of those facts that are favorable, and the Court has to say, as a matter of law, is that not a hostile work environment or is there a triable issue? And that's where Swenson comes in that you have to see where do these facts fit relative to Swenson because Swenson – we have to look at Swenson. We know that Swenson said that was – those facts were not sufficient for a hostile work environment. If yours don't rise to the level of Swenson, then the Court's going to be right. Your Honor, I would direct this Court's attention to Allison v. Brady, where the Court said, we look at this from the perspective of the victim. Exactly. Exactly. And here we have this. We have sufficient evidence to support a claim. But let me ask you this. For a hostile work environment, that is, for the emotional suffering and the kinds of things that you are alleging your client went through, does not the client have to be aware of that hostility in order to have it be hostile? She was aware of the act of June 29, 2001, in which she was watching her. And within an hour thereafter, she learned that on three previous occasions, Tony Cable herself had come to know that Mr. Beasley was again watching her with binoculars. Those acts, coupled with the previous complaints given to Birtling, rise to the – Establish a hostile work environment for the entire period after October 24 through June 2001? No, Your Honor. Post-June 29. Okay. But she stuck with her deposition testimony, which where she says that she went about her business carefree, not caring who was around between October 24 and June 29. She stuck with that deposition testimony. So the evidence shows that during that period, she was not either subjectively or objective – she didn't objectively or subjectively find the workplace hostile. That is correct, Your Honor. So then at that point, when she goes back and says, okay, you know, now I'm finding this out, do something, they transfer them. Yes, but it was the combined examples of mistreatment that caused her to suffer after June 29, a year to a year later. After he had been removed, she's claiming that she has a hostile work environment? Yes, knowing that he was still there, knowing that the city was impotent to ever stop it. Well, okay. I think we understand your position. Thank you.
judges: Schroeder, Farris, Callahan